**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-6665

GREGORY ALLEN BONNIE,

Petitioner - Appellant,

v.

WARDEN DUNBAR,

Respondent - Appellee.

-------------------------------------------------------

DUE PROCESS INSTITUTE; NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS,

Amici Supporting Appellant.

Appeal from the United States District Court for the District of South Carolina, at Florence. David C. Norton, District Judge. (4:23-cv-01215-DCN)

Argued: September 10, 2025                    Decided: November 5, 2025

Before NIEMEYER, WYNN, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Quattlebaum joined. Judge Wynn wrote a dissenting opinion.

**ARGUED:** Patricia Louise Richman, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant. Kimberly Varadi Hamlett, OFFICE OF

THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee. **ON BRIEF:** John L. Warren III, LAW OFFICE OF BILL NETTLES, Columbia, South Carolina, for Appellant. Adair F. Boroughs, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. Timothy W. Grinsell, HOPPIN GRINSELL LLP, New York, New York, for Amici Due Process Institute and National Association of Criminal Defense Lawyers.

NIEMEYER, Circuit Judge:

To promote the release of prisoners who possess a reduced risk of recidivism and thus reduce the federal prison population, Congress enacted Title I of the First Step Act of 2018 ("FSA"), which incentivizes qualified federal prisoners to participate in and complete "recidivism reduction programs or productive activities" and thereby earn various benefits, including generous jail-time credits. 18 U.S.C. § 3632. The FSA, however, denies the particular benefit of jail-time credits to any prisoner "serving a sentence for a conviction under" 68 specified laws, including 18 U.S.C. § 924(c), which punishes "possession or use of a firearm during and in relation to any crime of violence or drug trafficking crime." *Id.* § 3632(d)(4)(D)(xxii); *id.* § 924(c).

Gregory Bonnie is serving a 144-month sentence in a federal prison camp in South Carolina, 120 months of which is attributable to convictions for drug trafficking offenses, which are not disqualifying crimes for FSA time credits, and 24 months of which is attributable to a conviction under § 924(c), which is a disqualifying crime. The Bureau of Prisons ("BOP") denied Bonnie's request for FSA time credits as to his 120-month sentence, treating his multiple prison terms "as a single, aggregate term of imprisonment," as required by 18 U.S.C. § 3584(c), and finding him ineligible because that aggregate sentence includes imprisonment for violating § 924(c).

In his petition for a writ of habeas corpus under 28 U.S.C. § 2241, Bonnie challenged the BOP's decision, arguing that he is eligible to earn FSA time credits during his service of the 120-month component of his sentence attributable to his convictions for drug trafficking, even though he acknowledges that he cannot earn FSA time credits during

3

his service of the 24-month component attributable to his § 924(c) conviction.  The district court denied his petition, concluding that Bonnie's position is not supported by the texts of the FSA and § 3584(c), and Bonnie appealed.

Because Bonnie's multiple-term sentence includes a sentence for a disqualifying conviction and is, by reason of § 3584(c), to be treated as a single aggregate sentence, we conclude that Bonnie is ineligible for FSA time credits.  We therefore affirm.

I

After Bonnie pleaded guilty in 2005 to drug trafficking, in violation of 21 U.S.C. §§ 841 and 846, and possession of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c), the district court sentenced him on November 5, 2005, to 120 months' imprisonment for his drug trafficking conviction and a consecutive 60 months' imprisonment for his § 924(c) conviction, for a total of 180 months' imprisonment.  The court also required him to serve eight years of supervised release — an eight-year term for his drug trafficking conviction and a concurrent five-year term for his § 924(c) conviction.

Bonnie was released from prison in June 2017 and then began serving his terms of supervised release.

While on supervised release, however, Bonnie again engaged in drug trafficking, and he pleaded guilty to two drug trafficking crimes, as well as to violating the conditions of his supervised release.  On May 27, 2021, the district court sentenced him to 120 months' imprisonment for his new drug trafficking convictions, revoked his November 5, 2005

4

terms of supervised release, and sentenced him on the revocation to a consecutive term of 24 months' imprisonment, for a total of 144 months' imprisonment. The court committed him to the custody of the BOP, which assigned him to serve his sentence at the Satellite Prison Camp at FCI Williamsburg in Salters, South Carolina.

Several months later, while serving his sentence, Bonnie requested that the BOP classify him as eligible to receive FSA time credits with respect to the 120-month portion of his sentence, at the same time recognizing that the 24-month portion of his sentence for violating supervised release on his 2005 convictions, including one under § 924(c), made him ineligible for FSA time credits when serving that sentence. The BOP denied Bonnie's request, noting that "[m]ultiple terms of imprisonment ordered to run consecutively or concurrently shall be treated for administrative purposes as a single, aggregate term of imprisonment," which, because he was sentenced in connection with his violation of § 924(c), required that Bonnie's 144-month sentence be treated as ineligible for FSA time credits. Bonnie thereafter exhausted his administrative remedies.

Bonnie filed this petition for a writ of habeas corpus under 28 U.S.C. § 2241 in the district court, and the respondent Warden R.S. Dunbar filed a motion for summary judgment, seeking dismissal of the petition. In a thorough 25-page opinion, the district court granted Warden Dunbar's motion and denied Bonnie's petition. The court identified the relevant question as whether the "24-month § 924(c) revocation sentence tainted the separately imposed 120-month drug sentence such that Mr. Bonnie is ineligible to earn FSA time credits for the entire 144-month sentence." After conducting an analysis of 18 U.S.C. §§ 3623(d)(4)(D) and 3584(c), the district court concluded:

5

In sum, the court finds that the plain text and statutory context of the FSA indicate Congress's intention that an inmate convicted of multiple offenses, at least one of which is ineligible to earn time credits under the FSA, is ineligible to earn time credits under the FSA because the BOP is statutorily mandated to aggregate the sentence.

The court added, "Bonnie has offered no statute or caselaw to support a contrary interpretation," and it cited numerous decisions nationwide that have uniformly rejected Bonnie's interpretation.

From the district court's judgment dated May 10, 2024, Bonnie filed this appeal.

II

Bonnie contends that, while he is concededly ineligible for FSA time credits when serving his 24-month revocation sentence for violating § 924(c), he is nonetheless eligible for the credits when serving his consecutive 120-month sentence for drug trafficking. As he argues:

> While Mr. Bonnie "is serving" the § 924(c) revocation sentence, he is ineligible to earn time credits under the plain language of the FSA. But after completion of that sentence, he will no longer be "serving a sentence" for an ineligible conviction.

He asserts that the statutory text is clear, directing the "BOP to calculate credits on any permitted sentence, and *consecutive sentences are different sentences*." (Emphasis added). Thus, he argues that § 3632(d)(4)(D) disqualifies "a sentence" and that the components of a multiple-term sentence are to be treated distinctly, each as "a sentence." He therefore concludes that the district court erred in disqualifying him from FSA time credits during his entire 144-month sentence. To make that argument, he relies mainly on the portion of the FSA's text referring to a *single* disqualifying sentence — "if a prisoner is serving *a*

6

sentence for *a* conviction," 18 U.S.C. § 3632(d)(4)(D) (emphasis added) — which, he argues, requires that each sentence be assessed and applied separately.

Bonnie's argument presents a question of statutory interpretation, which we review de novo. *See Rosemond v. Hudgins*, 92 F.4th 518, 523 (4th Cir. 2024); *United States v. Thomas*, 32 F.4th 420, 423 (4th Cir. 2022). And in construing a statute, we read it in the context of its overall statutory scheme. *See West Virginia v. EPA*, 597 U.S. 697, 721 (2022). Thus, our focus is "to construe statutes, not isolated provisions." *King v. Burwell*, 576 U.S. 473, 486 (2015) (cleaned up). With these principles in hand, we turn to the FSA.

Title I of the First Step Act of 2018, entitled "Recidivism Reduction," requires the Attorney General to develop a "risk and needs assessment system" to be used by the BOP (1) to determine each federal prisoner's "recidivism risk" and "risk of violent or serious misconduct"; (2) to assign the prisoner to "appropriate evidence-based recidivism reduction programs or productive activities"; and (3) to assess "when a prisoner is ready to transfer into prerelease custody or supervised release." 18 U.S.C. § 3632(a). And as an incentive to induce prisoners to participate in and complete the programs, the FSA authorizes the BOP to grant numerous benefits, including, among others, phone privileges, additional visitation time, and, as relevant here, "time credits" to reduce prison time. *Id*. § 3632(d). The FSA time credits, which are awarded in addition to good time credits earned pursuant to § 3624, are generous, giving prisoners "10 days of time credits for every 30 days of successful participation" in the programs and an "additional 5 days of time credits for every 30 days of successful participation" for prisoners assessed to be "at a minimum or low risk for recidivating." *Id*. § 3632(d)(4)(A).

7

The FSA is thus designed to identify prisoners with a lower risk of recidivating and to reward them with time credits for completing programming, and also to identify prisoners with a higher risk, who are not similarly rewarded. In line with these purposes, the FSA categorically disqualifies any prisoner from receiving time credits if the prisoner is serving a sentence for a conviction on any of 68 disqualifying crimes, including, as relevant to this appeal, a § 924(c) conviction. 18 U.S.C. § 3632(d)(4)(D)(xxii). Specifically, § 3632(d)(4)(D) provides: "A *prisoner is ineligible* to receive time credits . . . *if the prisoner* is serving a sentence for a conviction under . . . § 924(c)." *Id*. (emphasis added).

Bonnie parses the language of § 3632(d)(4)(D) to argue that his disqualification is limited to *the time* he is serving his disqualifying sentence and that he should receive FSA time credits when serving time for his non-disqualifying sentence. He reasons that the disqualifying language is linked to "a sentence" for a particular disqualifying crime, allowing him to earn credits for service of "a sentence" on any non-disqualifying crimes. He reasons further that the "a sentence" language limits the disqualification *to the time* while he is serving the disqualifying sentence. As he summarizes, "The FSA's text is clear. It directs BOP to calculate credits on any permitted sentence, and consecutive sentences are different sentences." Thus, he claims that while he "is serving" the § 924(c) revocation sentence, he is ineligible to earn time credits under the plain language of the FSA. But after the completion of that sentence, he will no longer be "serving a sentence for an ineligible conviction." (Internal quotation marks omitted).

8

At the outset, we note that the provision categorically disqualifies *a prisoner*, not *a sentence,* from receiving FSA time credits, defining such prisoner as one who is serving a sentence for a disqualifying crime. The text provides that the "*prisoner is ineligible* to receive time credits under this paragraph if the prisoner is serving a sentence for a conviction under [§ 924(c)]." 18 U.S.C. § 3632(d)(4)(D). Thus, when the only sentence that a prisoner is serving is for conviction of a disqualifying crime, he is categorically ineligible to receive FSA time credits because Congress has determined that the conduct underlying the crime predicts a high risk of recidivism.

Bonnie does not disagree with this understanding. Rather, he focuses on when a prisoner is serving multiple terms of imprisonment, whether consecutive or concurrent, and argues that each sentence must be treated separately. He thus reasons that he can receive FSA time credits *when* he is serving the sentence for the drug trafficking crime, even as he agrees that he cannot receive such credits when serving the sentence for the § 924(c) conviction. This argument, however, overlooks 18 U.S.C. § 3584(c), which precludes treating multiple-term sentences separately for administrative purposes. That statute, enacted as part of the Sentencing Reform Act of 1984, provides:

> Multiple terms of imprisonment ordered to run consecutively or concurrently shall be treated for administrative purposes *as a single, aggregate term of imprisonment*.

18 U.S.C. § 3584(c) (emphasis added). Both the BOP and the district court relied on the mandate in that provision to reject Bonnie's argument that his sentences should be assessed individually. They concluded that because § 3584(c) requires that the BOP treat Bonnie's multiple sentences as components of a single aggregate sentence, his 144-month sentence,

9

which, in part, is for a conviction under § 924(c), disqualified Bonnie. We agree, as the language of § 3584(c) is clear.

Bonnie does not argue otherwise. Rather, he argues that § 3584(c) does not apply *at all* because it is only applicable for "*administrative purposes*," and, as he argues, the BOP is not acting for administrative purposes in awarding FSA time credits. He maintains that discretion is necessary for "administrative purposes" and explains that the award of credits does not include a "broad delegation to the BOP to manage prisoners' sentences" so as to give it discretion. In this regard, he points to the FSA's mandatory language that the Attorney General *must* create the system for assessing prisoners, that the BOP *must* assign prisoners to programs, and that the BOP *must* grant FSA time credits for prisoners participating in and completing the programs.

This, however, reads "administrative purposes" far too narrowly. "Administration" does not define only acts of discretion. Rather, it can cover any acts that execute Congress's will. After a court imposes a sentence, it must commit the defendant "to the custody of the Bureau of Prisons until the expiration of the term imposed." 18 U.S.C. § 3621(a). And the BOP is then charged with selecting the place to incarcerate the defendant and carrying out the incarceration and supervising it, which includes detaining him, providing treatments for various conditions, providing programs, giving access to medical care as needed, and, of course, implementing the risk and needs assessment system. *See id.* § 3621(b), (e), (f), (h), (i). While all these requirements for implementing the sentence and supervising custody of the prisoner are mandatory, they also involve judgment and decisionmaking to give effect to the court's sentence. But, regardless of the

10

level of discretion involved, all are administrative functions.  Indeed, what the BOP does goes to the very heart of what is administrative — "to manage or supervise the execution, use, or conduct of" something, here, a sentence.  "Administrate, administer," *Merriam-Webster's Collegiate Dictionary* 16 (11th ed. 2020); *see also United States v. Wilson*, 503 U.S. 329, 335 (1992) (noting that the BOP is tasked with "the responsibility for *administering* the sentence[s]" of federal offenders (emphasis added)).  And indeed, the *Wilson* Court held that the BOP determines good time credits as an administrative matter:

> Because the offender has a right to certain jail-time credit . . . and because the district court cannot determine the amount of the credit at sentencing, the [BOP] has no choice but to make the determination *as an administrative matter* when imprisoning the defendant.

*Id.* (emphasis added); *see also United States v. LaBonte*, 520 U.S. 751, 758 n.4 (1997).  Finally, we note that § 3632, which includes the BOP's management of the FSA time credits, is contained in Title 18, Chapter 229 of the United States Code, which is denominated "Postsentence Administration."  *See INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) (recognizing that "the title of a statute or section can aid in" textual interpretation); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (same).

We have no difficulty in concluding that the BOP's implementation of the FSA time credits system is "administrative," as used in § 3584(c), and therefore that that provision applies to Title I of the FSA.

Bonnie also argues that § 3584(c) should not apply to FSA time credits because Congress did not explicitly quote the § 3584(c) language in the FSA while it did so in the

11

Second Chance Act of 2007, which authorizes a home detention pilot program. He reasons that because Congress chose to include such language in the Second Chance Act, its omission from the FSA indicates Congress's intent that § 3584(c) not apply to the FSA. Thus, under Bonnie's reading, § 3584(c) should be ignored unless it is explicitly quoted in a statute to which it would otherwise apply, rendering § 3584(c) useless.

More indicative, however, is that a comparison of the FSA's recidivism reduction programs to the Second Chance Act of 2007's home detention pilot program is quite inapt. The Second Chance Act does not include a jail-time credit program based on a prisoner's conduct, as does the FSA. Indeed, sentences are not assessed and reduced with time credits under the Second Chance Act, and the purpose and implementation of the home detention program are not the same. Rather, it is a compassionate response program in which elderly or terminally ill prisoners may be transferred to home confinement to complete their sentences. *See* 34 U.S.C. § 60541(g).

Moreover, the original text of the Second Chance Act was drafted at a different time — in 2007 — by a different Congress with different considerations in mind. And its disqualifying language is of a different style. For instance, the Second Chance Act applies to "*an offender* . . . who is serving a term of imprisonment *that is not* life imprisonment based on conviction for *an offense or offenses* that do not include any crime of violence . . . , sex offense . . . , or [other designated offenses]." 34 U.S.C. § 60541(g)(5)(A)(ii) (emphasis added). On the other hand, the FSA, which was drafted in 2018, provides that a "prisoner," not an "offender," is "ineligible if the *prisoner is serving* a sentence for a conviction under any of the following provisions of law," not for "offense or offenses." 18

12

U.S.C. § 3632(d)(4)(D) (emphasis added).  And while the Second Chance Act explicitly provides that multiple terms of imprisonment are to be treated as a single aggregate term, quoting the exact language of § 3584(c), *see* 34 U.S.C. § 60541(g)(5)(C), it does so in light of the fact that § 3584(c), as a regulation relating to sentences, might not otherwise be applicable because the Second Chance Act does not assess or change *sentences*.  Rather, it leaves the offender's sentence in place and only authorizes a different location to serve it.  The FSA, on the other hand, does change sentences, and therefore § 3584(c)'s regulation of sentences for administrative purposes would clearly apply.

Finally, even were we to take both the Second Chance Act and the FSA to be comparable, the fact that Congress chose in 2007 to quote § 3584(c) within the provisions of the Second Chance Act and did not do so in 2018 in the FSA cannot fairly lead to the conclusion that Congress therefore intended that § 3584(c) not apply to the FSA, when its terms are clearly applicable.

Making a similar argument, Bonnie contends that the BOP's treatment of sentences under a 1976 bilateral treaty with Mexico "is instructive."  The Treaty on the Execution of Penal Sentences provides for the transfer of Mexican nationals serving certain sentences in the United States to serve out their sentences in Mexico, and vice versa.  *See* U.S.-Mex., Nov. 25, 1976, 28 U.S.T. 7399, art. I.  The Treaty, however, does not apply to any "offense under the immigration or the purely military laws of a party."  *Id*. art. II(4).  In implementing the Treaty when multiple offenses are involved, the BOP lets a Mexican national serve the sentence for an immigration violation in the United States and then transfers the Mexican national to Mexico to fulfill the remainder of his sentences.  *See* BOP

13

Program Statement 5140.42 (April 10, 2015). This practice simply implements the terms of the Treaty, however, and is hardly relevant to a program for awarding good time or FSA time credits, where the BOP is administering the sentence and to which § 3584(c)'s aggregation provision is clearly applicable. Moreover, apart from the disqualified offenses, the BOP does indeed aggregate sentences in implementing the Treaty, as required by the implementing statute. *See* 18 U.S.C. § 4105(c)(4). That hardly helps Bonnie's argument that the BOP should not treat multiple sentences as a single aggregate sentence under § 3584(c).

In short, we conclude that § 3584(c) applies when construing § 3632 and thus directs the BOP to treat multiple sentences as a single aggregate sentence for administrative purposes, including the computation of FSA time credits. Bonnie is thus "serving a sentence" in connection with his § 924(c) conviction, defined by § 3584(c) to be his aggregate 144-month sentence. As such, he is ineligible for FSA time credits under § 3632(d)(4)(D).

Our interpretation of § 3632(d)(4)(D) also conforms, we believe, to the overall purpose of Title I of the FSA, which is designed to identify certain prisoners for early release — prisoners whom Congress has determined to be at low risk for recidivism and violence — and to provide them benefits, while detaining high-risk prisoners based on their elevated threat to recidivate. In distinguishing prisoners who are serving sentences for convictions of crimes predicting a high risk of recidivism from prisoners who are serving sentences for convictions of crimes not predicting a high risk of recidivism, the statute lists 68 crimes, any one of which, Congress has found, disqualifies the prisoner. Because

14

recidivism is predicted by the nature of the crime, the conduct inherent in the crime is critical to the FSA's operation. Thus, in a case where the defendant has been convicted of a multi-term sentence, if the defendant is incarcerated for conduct disqualifying him for FSA credits, whether supporting his entire sentence or only a part, that conduct predicts, as Congress has determined, that he has a high risk of recidivism and therefore is disqualified from receiving FSA time credits. And that high risk is not eliminated by the fact that the prisoner also committed a nondisqualifying crime. In short, the fact that the prisoner committed a disqualifying crime predicts a high risk of recidivism, which is the whole underlying basis for the FSA's denial of FSA time credits.

Bonnie nonetheless urges us to apply the rule of lenity against BOP's aggregation of his sentences. But that rule does not fit here. It only applies when courts "can make no more than a guess as to what Congress intended" and there is a "grievous ambiguity or uncertainty in the statute." *Muscarello v. United States,* 524 U.S. 125, 138–39 (1998) (cleaned up). And we conclude that there is no such degree of doubt. Section 3632(d)(4)(D) disqualifies *any prisoner* who is serving a sentence for a conviction under § 924(c), and for determining whether Bonnie's multiple-term sentence is such a disqualifying sentence, § 3584(c) directs the BOP to treat such a multiple-term sentence "as a single, aggregate term of imprisonment." And we also conclude that there is no grievous ambiguity or uncertainty that would render the rule of lenity applicable.

Finally, we note that every court that has considered the issue has reached the conclusion that we reach here today. *See Giovinco v. Pullen*, 118 F.4th 527, 529 (2d Cir. 2024) (holding that inmate serving concurrent sentences for eligible and ineligible offenses

15

was ineligible for FSA time credits); *Teed v. Warden Allenwood FCI Low*, No. 23-1181, 2023 WL 4556726, at *2 (3d Cir. July 17, 2023) (per curiam) (holding that BOP properly aggregated multiple sentences for the administrative purpose of determining an inmate's FSA eligibility and term of imprisonment); *Martinez v. Rosalez*, No. 23-50406, 2024 WL 140438, at *4 (5th Cir. Jan. 12, 2024) (per curiam) (holding that inmate transferred under bilateral treaty with Mexico was ineligible for FSA credit, where one of his multiple sentences was ineligible under the FSA); *Keeling v. Lemaster*, No. 22-6126, 2023 WL 9061914, at *1 (6th Cir. Nov. 22, 2023) (holding that prisoner's § 924(c) conviction rendered him ineligible for his aggregate sentence); *Sok v. Eischen*, No. 23-1025, 2023 WL 5282709, at *1 (8th Cir. Aug. 17, 2023) (per curiam) (holding that BOP properly aggregated multiple sentences under § 3584(c) for the purpose of calculating FSA time credits). Were we to accept Bonnie's interpretation, we would thus create an unfortunate circuit split.

\*        \*        \*

Because Bonnie is serving a revocation sentence for a conviction under 18 U.S.C. § 924(c) as a component of his single, aggregate 144-month sentence, he is ineligible for FSA time credits under 18 U.S.C. § 3632(d)(4)(D)(xxii). We therefore affirm the district court's judgment denying Bonnie's petition for a writ of habeas corpus.

AFFIRMED

16

WYNN, Circuit Judge, dissenting:

Can a prisoner "serve" a 24-month sentence for 144 months? Of course not. The proposition refutes itself. That obvious "no" answer should resolve this case. Yet to the extent inventive judicial minds might conjure some uncertainty, Congress wisely anticipated that far-fetched possibility. The text and purpose of the First Step Act—to enact criminal justice reform, particularly by incentivizing prisoners to participate in recidivism reduction programs—makes clear that Gregory Bonnie is entitled to accrue First Step Act time credits for the eligible portion of his sentence.

## I.

In 2004, Bonnie pleaded guilty to a drug-distribution-conspiracy offense under 21 U.S.C. § 841 and a related firearms-possession offense under 18 U.S.C. § 924(c). In 2005, he received a 120-month sentence on the drug conviction and a consecutive 60-month sentence on the firearms conviction, along with a total eight-year term of supervised release. He earned good-time credits while serving his sentences, which allowed him to be released on supervision in June 2017.

In January 2019, Bonnie was again indicted on drug-related charges. He pleaded guilty to two of the charges and, in April 2021, was sentenced to the mandatory minimum of 120 months on both, with the sentences to run concurrently. That same month, the district court revoked Bonnie's supervised release for his 2005 convictions in light of the new criminal charges and imposed two revocation sentences of 24 months each, to be served concurrently with each other but consecutively to the 2021 drug sentences. He is

17

currently in prison serving these 2021 sentences. With good-time credits, Bonnie's anticipated release date falls in January 2029.

The question posed by this case is whether Bonnie is eligible to potentially be released even sooner by taking advantage of an additional category of "time credits" available under the First Step Act of 2018.[1] The district court concluded that he is not. Our review is de novo. *Valladares v. Ray*, 130 F.4th 74, 80 (4th Cir. 2025).

## II.

"The First Step Act established a system of mandatory time credits for incarcerated individuals who participate in recidivism reduction programming, with limited exceptions." *Id.* at 77. These "time credits can be applied toward earlier placement in pre-release custody or supervised release." *Id.* at 79 (citing 18 U.S.C. § 3632(d)(4)(C)). Specifically, the First Step Act states that "[a] prisoner, except for an ineligible prisoner under [§ 3632(d)(4)(D)], who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits" as prescribed in the statute. 18 U.S.C. § 3632(d)(4)(A). Section § 3632(d)(4)(D) clarifies that "[a] prisoner is ineligible to receive time credits . . . if the prisoner is serving a sentence for a conviction under any of the following provisions of law," including, as relevant here, § 924(c). *Id.* § 3632(d)(4)(D), (d)(4)(D)(xxii).

---

[1] It is undisputed that a prisoner can earn both First Step Act time credits and good-time credits. *See* 18 U.S.C. § 3632(d)(6) ("The incentives described in this subsection [including First Step Act time credits] shall be in addition to any other rewards or incentives for which a prisoner may be eligible."); *id.* § 3624(b) (describing good-time credits).

It is undisputed in this case that Bonnie's 24-month revocation sentence is ineligible under § 3632(d)(4)(D) because the underlying 2005 case included a § 924(c) conviction. It is also undisputed that his 120-month 2021 drug sentence would not, on its own, be ineligible. The question is whether one ineligible conviction "taints" the total effective sentence, such that Bonnie cannot earn First Step Act time credits during *any* of the 144 months he is currently serving. The district court joined a significant number of other courts in concluding that it does.[2]

With great respect for my colleagues on this panel and elsewhere on the bench, I cannot agree. In my view, the text of the statute favors Bonnie's interpretation. So I would reverse and remand with instructions to grant Bonnie's habeas petition and order the Warden to allow Bonnie to earn First Step Act time credits while he is serving the eligible 120-month portion of his total effective sentence.

---

[2] *E.g.*, *Giovinco v. Pullen*, 118 F.4th 527, 529 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1947 (2025); *Colotti v. Peters*, No. 25-1191, 2025 WL 1321386, at *2 (3d Cir. May 7, 2025) (per curiam); *McNeill v. Ramos*, No. 23-6488, 2023 WL 6442551, at *1 (4th Cir. Oct. 3, 2023) (per curiam); *Martinez v. Rosalez*, No. 23-50406, 2024 WL 140438, at *3 (5th Cir. Jan. 12, 2024); *Oiler v. LeMaster*, No. 24-5033, 2025 WL 1864875, at *1 (6th Cir. Jan. 10, 2025) (per curiam); *Sok v. Eischen*, No. 23-1025, 2023 WL 5282709, at *1 (8th Cir. Aug. 17, 2023) (per curiam). *But cf. Hill v. King*, No. 23-CV-1365, 2024 WL 5690795, at *1 (D. Minn. Oct. 7, 2024) (accepting the petitioner's argument), *report and recommendation rejected*, No. 23-CV-1365, 2025 WL 1020604, at *4, *6 (D. Minn. Apr. 7, 2025) (stating that if the court "were writing on a truly blank slate, it would likely accept the [magistrate judge]'s recommended disposition and grant [the] petition," but that it felt constrained by circuit precedent and "the weight of the case law" to conclude otherwise); *Grigsby v. Gutierrez*, No. 22-16180, 2023 WL 8711819, at *1 & n.2 (9th Cir. Dec. 18, 2023) (per curiam) (declining to resolve the question).

A.

"When conducting statutory analysis, we must first determine whether the meaning of the statute is ascertainable through the text alone. The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. Employing various grammatical and structural canons of statutory interpretation helps guide our reading of the text. Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Valladares*, 130 F.4th at 80–81 (citations and internal quotation marks omitted).

As noted, the First Step Act provides that "[a] prisoner, except for an ineligible prisoner under [§ 3632(d)(4)(D)], who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits." 18 U.S.C. § 3632(d)(4)(A). But, per § 3632(d)(4)(D), "[a] prisoner is ineligible to receive [such] time credits . . . if the prisoner is serving a sentence for a conviction under any of the [enumerated] provisions of law."

My colleagues make much of the fact that § 3632(d)(4)(D) speaks of "ineligible prisoners," asserting that "the provision categorically disqualifies *a prisoner*, not *a sentence*." Maj. Op. at 9. For support, they explain that "[t]he text provides that the '*prisoner is ineligible* to receive time credits under this paragraph if the prisoner is serving a sentence for a conviction under [§ 924(c)].'" Maj. Op. at 9 (citing 18 U.S.C. § 3632(d)(4)(D)). Of course, the emphasis in that quotation of the statutory language is the majority's, not the statute's. Indeed, the definition of an ineligible prisoner focuses on

20

whether he "is serving a sentence for a[n ineligible] conviction," pointing us right back to the question of what sentence is being served. 18 U.S.C. § 3632(d)(4)(D). Simply declaring that the statute "categorically disqualifies *a prisoner*" does not make it so. Maj. Op. at 9.

And if, under the majority's view, a prisoner as an individual is categorically disqualified from earning time credits, does that categorical disqualification persist in perpetuity? Surely a prisoner who serves a sentence for a disqualifying crime is not disqualified from earning First Step Act credits for any future criminal sentences for the rest of his life; rather, he is disqualified if he "is serving" that sentence.

Before the Second Circuit, the Bureau of Prisons ("BOP") "acknowledge[d] that the most natural reading of § 3632(d)(4)(D), standing alone, might render ineligible only the individual sentence applicable to the ineligible offense." *Giovinco v. Pullen*, 118 F.4th 527, 530 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1947 (2025). I agree: to state the obvious, a prisoner is only "serving" a sentence for as long as the sentence may be served. Bonnie, therefore, will only "serve" his revocation sentence for 24 months; for the other 120 months of his total effective sentence, he will not be "serving a sentence for a conviction under" an ineligible statute.

The Warden argues, however, that the First Step Act was enacted against the background of another statute, 18 U.S.C. § 3584, which was enacted in 1984. Specifically, § 3584(c) states that "[m]ultiple terms of imprisonment ordered to run consecutively or concurrently shall be treated for administrative purposes as a single, aggregate term of imprisonment." So, the Warden reasons, the BOP must treat Bonnie's consecutive sentences "as a single, aggregate term of imprisonment"—and thus Bonnie is "serving a

21

sentence" for an ineligible conviction under the First Step Act for the entire 144 months. Courts have generally adopted this view in rejecting similar challenges brought by other prisoners.

That position, however, runs headlong into basic logic. A prisoner who receives both a 24-month sentence and a 120-month sentence (whether consecutively or concurrently) is not *serving* the 24-month sentence for the entirety of the period of imprisonment,[3] regardless of whether the sentences are "aggregate[d]" "for administrative purposes." 18 U.S.C. § 3584(c). This is most apparent with a consecutive sentence like Bonnie's: even if the 24-month sentence is broken up into pieces throughout the aggregate 144-month sentence, at any given moment, Bonnie can legally only be serving one or the other. But this logic holds true for a concurrent sentence, too, because—to state the obvious—24 is less than 120. So, again, even if the 24 months are spread throughout the 120-month aggregate sentence, at any given moment of the concurrent sentences, the prisoner is either serving both sentences (which he could only do for 24 months total) or only the remaining 96 months of the longer sentence. How a sentence is treated for administrative purposes might alter *when* a prisoner is serving one portion of his sentence

_____

[3] To be sure, the Dictionary Act provides that, "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise[,] . . . words used in the present tense include the future as well as the present." 1 U.S.C. § 1. So, although § 3632(d)(4)(D) refers to a prisoner who "is serving a sentence for" an ineligible conviction—using a form of the present tense—that reference might be read to include a prisoner who *will* serve a sentence for an ineligible conviction, such that if he has even one day left of the ineligible sentence, he is ineligible. I am persuaded, however, that this is a situation where "context indicates otherwise." For one thing, the statute does not use the simple present tense, but instead uses the present progressive tense, indicating an action that is occurring *now*. And I think context otherwise supports that reading for all the reasons explained in this dissent.

or another, but it does not change the fundamental fact that, on each specific day, he is either serving a particular sentence, or he is not. Put simply, it is impossible to "serve" a 24-month sentence for 144 months.

The majority rejects Bonnie's argument that § 3584(c) applies only for "administrative purposes" and that awarding FSA time credits does not fall within that category. Maj. Op. at 10. It explains that the BOP is tasked with "selecting the place to incarcerate the defendant and carrying out the incarceration and supervising it," tasks which are comprised of "administrative functions." Maj. Op. at 10–11. But even if we accept that premise for the moment, why should that mean that the eligibility provision in § 3632—enacted years later, in the context of a major recidivism-reduction effort by Congress—could not specify that sentences should be viewed differently to effectuate the goals of that program? Particularly when that result seems the most natural from the text of the statute, I am not convinced that we should reject that straightforward reading in favor of applying a more general preexisting provision. *Cf. D.B. v. Cardall*, 826 F.3d 721, 735–36 (4th Cir. 2016) (explaining the canon of statutory construction providing that the specific terms of a statute defeat the general, absent indications of contrary legislative intent).

Further, the Warden has not disputed Bonnie's assertion—supported by a citation to a BOP record—that BOP has the ability to "parse" prisoners' sentences, and related "period[s] of ineligibility and eligibility," "down to the day." J.A. 144; *see* J.A. 145. And notably, First Step Act time credits are earned based on days of participation in applicable programming. *See* 18 U.S.C. § 3632(d)(4)(A) (providing that "[a] prisoner shall earn 10

23

days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities," and that certain low-risk offenders "shall earn an additional 5 days of time credits for every 30 days of successful participation" in such programming); *Gonzalez v. Herrera*, 151 F.4th 1076, 1082 (9th Cir. 2025) ("[E]arned time credits are an amount placed at a prisoner's disposal—a store of value (measured in days) that incarcerated individuals receive as a return for their participation in qualified programs."). There is thus no apparent reason why BOP could not designate periods as eligible or ineligible for purposes of First Step Act time credits, and then apply days of successful participation in relevant programming toward the 30-day requirement during eligible periods.

B.

In addition to the basic logic of what it means to serve a sentence, the statutory structure and the use of different language in another section of the First Step Act persuade me that Bonnie has the stronger textual argument.

The structure of the statute supports reading it to favor greater eligibility. "The First Step Act of 2018 may be the most significant criminal justice reform bill in a generation." *Pulsifer v. United States*, 601 U.S. 124, 155 (2024) (Gorsuch, J., dissenting) (cleaned up) (quoting Brief for Sen. Richard J. Durbin et al. as *Amici Curiae* at 9, *Terry v. United States*, 593 U.S. 486 (2021)); *accord Gonzalez*, 151 F.4th at 1078 (describing the First Step Act as a "transformative law with far-reaching implications that have yet to all be realized"). As relevant to this case, the First Step Act created "a system to incentivize incarcerated individuals to complete programs intended to reduce their risk of recidivism," with a

24

variety of incentives, including "the big one—time credits." *Gonzalez*, 151 F.4th at 1078–79.

Specifically, Title I of the First Step Act, which includes § 3632, is labeled "Recidivism Reduction." First Step Act of 2018, Pub. L. No. 115-391, § 101, 132 Stat. 5194, 5195. Section 3632 itself is labeled "[d]evelopment of risk and needs assessment system" and requires the development of such a system to, among other things, "determine the recidivism risk of each prisoner." 18 U.S.C. § 3632(a)(1). It also mandates that this system "provide incentives and rewards for prisoners to participate in and complete evidence-based recidivism reduction programs," including the time credits at issue here. *Id.* § 3632(d).

Given the goal of reducing recidivism and incentivizing participation in recidivism reduction programs, the structure of the statute supports reading it to favor greater eligibility. *See Gonzalez*, 151 F.4th at 1088 (noting that, in light of the time-credits provision's purpose, "time credits should maintain utility as an incentive for prisoners to continue programming, thereby reducing recidivism and the cost of managing the nation's incarcerated and supervised population," but that the BOP's "interpretation allows for earned time credits to lose their worth as an incentive").

We held as much in our recent decision in *Valladares v. Ray*. Rejecting an overly stringent BOP interpretation of the time-credits provision, we explained that "Congress passed the First Step Act to reform our criminal legal system and expand opportunities for those who are incarcerated. But instead of granting [the petitioner] the opportunities for which he was eligible, BOP adopted an untenable interpretation of the statute to bar [him],

25

and others similarly situated, from earning time credits for participation in recidivism reduction programming. In contravention of Congress' command, BOP's interpretation strips defendants of the incentive to participate in these programs to better themselves and attain the skills they need to be productive members of society. That contradicts the text of the First Step Act." *Valladares*, 130 F.4th at 85; *see also Gonzalez*, 151 F.4th at 1078 (rejecting yet another harsh BOP interpretation of the time-credits provision).

The same is true here: the full context of the First Step Act emphasizes leniency, and the structure of the particular section at issue emphasizes reducing recidivism. The Warden's stingy interpretation of the time-credits provision undermines both statutory goals.

"The interpretive canon that Congress acts intentionally when it omits language included elsewhere" also strongly supports Bonnie's interpretation in this case. *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 392 (2015). The First Step Act modified a preexisting home-detention program to include "eligible terminally ill offenders," which it defined in 34 U.S.C. § 60541(g)(5)(D) as "an offender in the custody of the [BOP] who . . . is serving a term of imprisonment based on conviction *for an offense or offenses that do not include*" certain enumerated crimes. First Step Act, § 603, 132 Stat. at 5238–39 (codified at 34 U.S.C. § 60541(g)(1)(A), (5)(D)) (emphasis added). This definition explicitly removes from eligibility someone with multiple offenses if even *one* of them is disqualifying. Thus, the same Congress that enacted the First Step Act time-credits program knew how to limit eligibility in a program if a prisoner had *any* disqualifying

26

convictions—but chose not to use the same language in § 3632(d)(4)(D).[4] Because "Congress knows how to write a law" limiting eligibility if a prisoner has *any* disqualifying convictions—after all, "it did so with [§ 60541(g)(5)(D)]"—"Congress's choice of words" in § 3632(d)(4)(D) "necessarily indicates that earned time credits" are to be understood differently. *Gonzalez*, 151 F.4th at 1084 (applying this rule in a different context); *accord Valladares*, 130 F.4th at 83 ("Where 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)).

And it bears noting that, although the majority opinion correctly states that the Second Chance Act was enacted in 2007, Maj. Op. at 12, including the eligibility provision for elderly offenders, the eligibility provision disqualifying certain terminally ill offenders from taking advantage of the home-detention program was added through the First Step Act of 2018—that is, the same law that created the recidivism reduction program at issue here. So the same Congress that excluded from the home-detention program a terminally ill offender who "is serving a term of imprisonment based on conviction for an offense or offenses that *do not include*" certain enumerated crimes, 34 U.S.C. § 60541(g)(5)(D) (emphasis added), chose to exclude from the recidivism-reduction credits program a

---

[4] Notably, this highly compelling difference in language does not appear to have been discussed in any other case considering the question before us, limiting those cases' persuasive force.

27

prisoner who "*is serving a sentence for a conviction under*" enumerated laws, 18 U.S.C. § 3632(d)(4)(D) (emphasis added).

Moreover, the First Step Act's divergent definitions in § 60541(g)(5)(D) and § 3632(d)(4)(D) were enacted against the backdrop of a preexisting definition in § 60541(g)(5)(C). That provision explicitly defines "term of imprisonment" as used in that section using the same definition as § 3584(c), stating that it "includes multiple terms of imprisonment ordered to run consecutively or concurrently, which shall be treated as a single, aggregate term of imprisonment for purposes of [§ 60541]." 34 U.S.C. § 60541(g)(5)(C). If, as the Warden argued below, "[t]here was no reason for Congress to say anything within [§ 3632(d)(4)(D)] about how consecutive sentences were to be regarded by the BOP, because Congress had already said everything it needed to say within § 3584(c)," then the same would presumably be true for § 60541(g)(5)(C), and the definition provided in that statute was superfluous. J.A. 258 (quoting *Walton v. Fikes*, No. 22-CV-1998 (JWB/TNL), 2023 WL 6283298, at *2 (D. Minn. Aug. 10, 2023), *report and recommendation adopted,* No. CV 22-1998 (JWB/TNL), 2023 WL 6282897 (D. Minn. Sept. 26, 2023)). Because "a competing interpretation would avoid superfluity," "[t]he canon against surplusage" may "be meaningful" here. *Bufkin v. Collins*, 604 U.S. 369, 387 (2025).

My colleagues urge that Congress included § 60541(g)(5)(C) to make explicit that multiple terms of imprisonment are to be treated as a single aggregate term there, reasoning that § 3584(c) might not otherwise apply to the home-detention program: "the Second Chance Act does not assess or change *sentences,*" the majority explains, but rather

28

"authorizes a different location to serve" a sentence. Maj. Op. at 13. So, the logic goes, there is no superfluity even without accepting Bonnie's interpretation of the statute. That distinction is irrelevant. The crux of the matter is that both programs look at crimes of conviction to determine eligibility. While one program explicitly makes an ineligible conviction a total disqualifier, the other program does not. So even if that interpretive distinction were compelling, it could not overcome the fact that the First Step Act Congress enacted two different eligibility provisions with divergent language excluding different individuals from taking advantage of statutory benefits. We must not assume that Congress did so haphazardly.

The distinction between § 60541(g)(5)(D) and § 3632(d)(4)(D) is further strengthened by Congress' use of different terminology. In enacting the First Step Act, Congress used "term of imprisonment" in the definition of "prisoner" ("a person who has been sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense," 18 U.S.C. § 3635(4)) as well as in § 60541(g)(5)(D) ("[a prisoner who] is serving a term of imprisonment based on conviction for an offense or offenses that do not include [certain offenses]"). But it used "sentence" in the time-credit provision in § 3632(d)(4)(D) ("the prisoner is serving a sentence for a conviction under [certain offenses]"). As Bonnie argues, this suggests that "Congress expressly distinguished between 'a sentence' for a particular conviction and the overall 'term of imprisonment.'" Opening Br. at 17.

True, the Second Circuit correctly pointed out that Congress itself used the terms interchangeably in 1984 when it enacted § 3584(c), noting that "[t]he heading of § 3584 is 'Multiple sentences of imprisonment' and the caption of § 3584(c) is 'Treatment of

29

multiple sentence as an aggregate' while § 3584(c) itself refers to 'terms of imprisonment.'" *Giovinco*, 118 F.4th at 532 n.2. And "[t]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." *Yates v. United States*, 574 U.S. 528, 540 (2015) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998)).

Still, it is notable that these terms appear to be used differently across different sections of the First Step Act of 2018, which of course was enacted decades later by a different Congress. Typically, where a statute "has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457–58 (2022) (quoting A. Scalia & B. Garner, *Reading Law* 170 (2012)). So the fact that § 3584(c) used the terms interchangeably does not mean that the First Step Act—enacted 34 years later—also did.

Finally, the Second Circuit focused on the aggregation provision and "precedent holding that the aggregation provision applies to other sentencing credit programs"—specifically, "time-served credits (§ 3585), good-time credits (§ 3624), and residential drug-abuse program credits (§ 3621)." *Giovinco*, 118 F.4th at 531–32. However, those other programs are inapposite. Time-served credits are available to all prisoners, so there is no need to evaluate the impact of different components of the sentence. 18 U.S.C. § 3585(b). Good-time credits are available to all prisoners serving "a term of imprisonment of more than 1 year" unless their sentence is life, so aggregating sentences actually benefits prisoners. *Id.* § 3624(b)(1).

30

Further, that provision explicitly uses the phrase "term of imprisonment," like the aggregation provision, and explicitly falls under BOP's administrative control. *Id.* ("[Credits are] subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations."). And the residential drug-abuse program uses discretionary language (the period of custody "may be reduced by the [BOP]") that leaves eligibility determinations to BOP. *Id.* § 3621(e)(2)(B). Thus, none of the case law interpreting any of those provisions is relevant to the question at hand.

At bottom, Bonnie's view of the statute is much more persuasive. The statutory emphasis on promoting rehabilitation, the use of different language in the terminally-ill-offender provision, and the basic logic of what it means to "serve a sentence" counsel in favor of agreeing with Bonnie that he will only "serve" the ineligible sentence for 24 months out of the aggregate 144 months.

## C.

While the text and structure of the relevant statutory provisions compel the conclusion that Bonnie's interpretation is the sound one, it bears noting the peculiar—if not outright absurd—consequences that flow from the majority's reading. Under that interpretation, Bonnie would be barred from earning First Step Act credits for his otherwise-eligible 120-month sentence, while serving a mere 24-month ineligible revocation term. This disparity is so illogical that it strains credulity to suggest Congress intended it.

31

And Bonnie's case is hardly the outer limit of the absurdity: another court recently found that a 2-month sentence for possession of a contraband cell phone in prison disqualified an individual from earning First Step Act credits for the entirety of his separate 132-month sentence for drug conspiracy. *See Hill v. King*, No. 23-CV-1365, 2025 WL 1020604, at *6 (D. Minn. Apr. 7, 2025). So, a minor two-month offense rendered ineligible a sentence *sixty-six times longer*—precisely the kind of irrational result Congress could not have intended.

Those examples are troubling enough. But the majority's interpretation threatens consequences still more untenable. Consider a case in which an individual is sentenced to decades in prison for an eligible offense, and only days for an ineligible one.

Worse still, the majority invites manipulation that undermines the very purpose of the First Step Act recidivism reduction program. One district court, for example, recently increased the sentence it imposed to account for potential reductions in prison time served due to earned First Step Act credits—which the Second Circuit rejected as a stand-alone sentence justification. *United States v. James*, 151 F.4th 28, 40–43 (2d Cir. 2025). Now, the majority opens the door to similar gamesmanship by prosecutors, who may pursue minor ineligible charges to preclude defendants from obtaining recidivism reduction credits for substantial portions of their sentences. It is inconceivable that the Congress which drafted the First Step Act—legislation designed to encourage rehabilitation— intended its core incentive to be so easily nullified.

32

III.

Great respect is due to the many judges—including my distinguished friends in the majority—who have confronted this question and reached a different conclusion. But to be sure, many of those judges did not have the benefit of counseled briefing for the petitioner, and many considered the question under the now-displaced regime of *Chevron* deference.

In that pre-*Loper Bright* world, courts often yielded to agency interpretations that strayed from statutory text. But when viewed anew—free of such deference and guided by the words Congress actually enacted—the statute admits to one sensible reading: Bonnie's interpretation best accords with the text, structure, and purpose of the First Step Act.

For that reason, and with due respect to my colleagues, this opinion must part company with the majority. I dissent.